775 F.2d 1240
 120 L.R.R.M. (BNA) 3059, 54 USLW 2270,
1 Indiv.Empl.Rts.Cas. 1726
 Brendan BUSCHI; Dennis B. Draper, Jr.; Donald Vassey;
Susan Andrews; Wanda Scott; Elizabeth G.
Tsatsios and Jerry Wall, Appellants,
v.
Leo E. KIRVEN, Jr.; William J. Burns; Jean Harris; C.
William Brett; Raymond F. Holmes; Glenn R. Yank; Paul L.
Hundley; David Colton; Charles Spraker; L.F. Harding;
John N. Dalton; Kenneth B. Yancey; Carolyn O. Marsh;
Joseph J. Bevilacqua; Anne S. Goodman; Ruth Cook; Ralph
DeWitt; Robert Harrison; Philip E. Denton; Charles S.
Robb; Patrick A. O'Hare; Deborah L. Bryant; Robert Ware;
Mary Bradshaw and Willis Spaulding, Appellees.
 No. 84-1280.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 4, 1985.
Decided Oct. 29, 1985.
 
 Edward M. Wayland, Charlottesville, Va. (Wayland & Williams, Earl R. Burton, Charlottesville, Va., on brief) for appellants.
 Karen A. Gould, Richmond, Va., Carter R. Allen, Waynesville, Va., John M. Claytor, Richmond, Va. (James W. Morris, III, Crews, Hancock & Dunn, Richmond, Va., Allen, Dalton & Watkins, Waynesboro, Va., Browder, Russell, Morris & Butcher, Richmond, Va., on brief) for appellees.
 Before RUSSELL and SPROUSE, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 DONALD RUSSELL, Circuit Judge:
 
 
 1
 Seven dismissed employees of the State Western Mental Hospital, located at Staunton, Virginia, have filed under 42 U.S.C. Sec. 1983 two actions charging basically that their discharges were the result of a conspiracy in violation of both their first amendment and due process rights. They have named as defendants some twenty-five state officials and employees, ranging from the Governor of the Commonwealth down through the department heads at the Hospital. The only difference in the plaintiffs' two complaints is the addition in the second complaint of two counts stating causes of actions for a "conspiracy to deprive mental patients [at the Hospital] of the equal protection of the laws" and the inclusion of five additional defendants.
 
 
 2
 Both complaints begin by stating in separate counts five causes of action. In the first of such causes of action, the plaintiffs allege that they had complained through institutional channels of patient abuse, racial discrimination, administrative and clinical mismanagement, waste and misuse of state funds, and harassment of employees at the Hospital. They also allege that they had communicated such complaints to "representatives of the media," the American Civil Liberties Union (ACLU), the National Association for the Advancement of Colored People (NAACP), and the Equal Employment Commission (EEOC), as well as to the Governor of the Commonwealth and various Commonwealth officials. As a consequence of these complaints, so published by them, they allege they were subjected to disciplinary actions during the period from April 27, 1981 up to July 20, 1981, at which time they were "fired" because of what they allege to have been the exercise of their first amendment rights. In their separate due process cause of action they allege that they were denied a pre-termination hearing and that they had been prevented "from pursuing their complaints through [state administrative] grievance procedures." Their third cause of action purports to state a right of action under 42 U.S.C. Sec. 1985(3) by a class of "whistleblowers," of which they claim to be representatives, who had been discharged for the exercise of their right to expose publicly wrongdoing by the Hospital administration; and their fourth cause of action under 42 U.S.C. Sec. 1986, linked to their Sec. 1985(3) action, is for failure to prevent or correct the wrongs allegedly perpetrated by certain of the defendants in the third cause of action. The fifth cause of action was a pendent claim under certain Commonwealth statutes. The additional two causes of action in the enlarged second complaint set up a right of action for injuries suffered by the Hospital patients as a result of improper care. In their prayer for relief on all these charges, the plaintiffs sought a declaration of rights, reinstatement, backpay and restoration of benefits, injunctive relief against harassment by the Hospital administration, and monetary damages in the sum of seven million dollars ($7,000,000). Though they had added in their second complaint two causes of action for patient relief, the plaintiffs omitted any specific request for relief on behalf of the patients.
 
 
 3
 All the defendants--sometimes in joint answers, and sometimes separately--answered the complaints. The parties exchanged interrogatories. The defendants thereupon filed motions for summary judgment under Fed.R.Civ.P. 56, supporting these motions with affidavits and certain of the answers of plaintiffs to interrogatories. The plaintiffs responded with affidavits. On this record, the motions came on for hearing before the district judge, who, after extensive oral and written arguments, filed his order granting the motion in part and denying it in part.
 
 
 4
 In his order on the motions for summary judgment, the district judge held that the plaintiffs' first cause of action, which stated, as he construed it, a "violation of the plaintiffs' right to freedom of speech, a charge made basically under the First Amendment" was "a charge which should properly go forward." He found without merit the plaintiffs' due process claim as stated in their second cause of action, ruling, on the basis of Robertson v. Rogers, 679 F.2d 1090 (4th Cir.1982), that there was "not a property or liberty interest in state employment." Plaintiffs' third cause of action under section 1985(3) was dismissed on the ground that there was "no showing of any disparity in the treatment of these employees." The section 1986 action, set forth in plaintiffs' fourth count, was dismissable because it required as a predicate a violation of section 1985(3) and fell with the dismissal of the section 1985(3) action. The pendent state action, constituting plaintiffs' fifth cause of action, was dismissed because Section 18.2-499 of the Code of Virginia provided only criminal penalties and Section 18.2-500 requires a finding of an illegal conspiracy. Finally, the district judge dismissed the two causes of action which the plaintiffs had sought to maintain on behalf of Hospital patients for lack of standing on the part of the plaintiffs to maintain such suits.
 
 
 5
 In addition to these rulings, the district judge had granted individual motions for dismissal filed by certain defendants. The first of the defendants so dismissed were the defendants Bradshaw and Spaulding, who were the chairperson and the counsel, respectively, of the Local Human Relations Committee, to which had been assigned the investigation and reporting on the patient abuse claims raised by the defendants. The district judge found that the two were quasi-judicial officials who in the matters in controversy were acting entirely in their official duties and, under Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), were immune from suit. Similarly, the defendant O'Hare, the assistant State Attorney General, whose only connection with the case was his assignment as attorney to the Mental Health and Mental Retardation Department, was dismissed on the same grounds. The district judge finally dismissed all charges of conspiracy against those state officials at central headquarters in Richmond who had no direct connection with the Western Mental Hospital, on the ground that "state employees engaged in the exercise of their duties, acting as state officials, could not be charged with conspiracy." Under this ruling, defendants Robb, Dalton, Bevilacqua, Harris, Yancey, Marsh, Ware, Bryant, and Goodman were eliminated as defendants in the first cause of action stated by the plaintiffs in both complaints, which was the only cause of action permitted to "go forward."
 
 
 6
 At the time of the disposition of the motions for summary judgment, the district judge consolidated the first amendment claims of the plaintiffs as stated in the two complaints of the plaintiffs. As so consolidated, the causes came on for trial before a jury. From a jury verdict in favor of the defendants and the judgment entered thereon, the plaintiffs have appealed. We affirm.
 
 
 7
 Before considering the grounds of error asserted by the plaintiffs, a sketch of the facts largely as developed at the hearing on the motions for summary judgment is appropriate. All of the plaintiffs were employees in the Department of Social Services at the Western Mental Hospital, the plaintiff Buschi being the head of such department. In the summer of 1980 the defendant Burns was appointed administrator and chief executive officer at the Hospital. It is suggested in the affidavits of the defendants, not specifically disputed in plaintiffs' affidavits, and plainly established on the record as a whole, that the plaintiff Buschi and a close associate, Gary Hardley,[1] who was the director of Quality Assurance and Education Services at the Hospital, were strongly opposed to, and did everything they could to prevent Burns' appointment. When disappointed in their efforts to thwart Burns' appointment, they began a concerted effort to effect his removal as administrator. By his own affidavit, Buschi, who appears from the record to have been the leader on behalf of the plaintiffs in all the matters resulting in this lawsuit, raised, as early as September 1980 and continuing unabated in the following months, repeated complaints questioning the legality of admission practices at the Hospital, (practices which in one instance at least dated back as far as 1974) the propriety of the treatment of so-called "forensic" patients, the carrying out of alleged unauthorized research, racial discrimination, the improper, if not illegal, relationship between the Hospital and the University of Virginia, and more importantly, patient abuse. Others among the plaintiffs made similar complaints--some of them in practically the same language as the complaints of the plaintiff Buschi.
 
 
 8
 These complaints, of Buschi and Hardley in particular, were filed through regular institutional channels, but also, as the plaintiffs alleged in their complaints, were publicized and pressed, beginning as early as October, 1980, by them in repeated approaches to representatives of the Richmond and Washington press, to the ACLU, to the NAACP, to the EEOC, and to most of the top officials of the Commonwealth government. All of these complaints required investigations and in certain instances resulted in hearings conducted by officials not directly involved with administration at the Hospital on at least two or three occasions during the first part of 1981. In particular there was an internal investigation of the charges of patient abuse carried out by an ad hoc committee which made an extensive inquiry and filed a report with the Department. In the meantime, the plaintiffs had induced the ACLU to request an investigation of alleged patient abuse at the Hospital.[2] All the subjects listed in the request of the ACLU related strictly to patient abuse.
 
 
 9
 On May 29, 1981, the State Human Rights Committee responded to the ACLU request by directing the convening of a Local Human Rights Committee (the Committee) to investigate the complaints as filed by the ACLU at the instance of the plaintiffs and Hardley. The Committee was appointed under regulations issued by the Department of Mental Health and Mental Retardation pursuant to Commonwealth statutes to "receive complaints and ... [to] investigate" any "alleged violations of patients' or residents' rights at a hospital or other facility" operated under the Department of Mental Health and Mental Retardation. The plaintiffs, as well as Hardley, were advised of the referral of their charges to the Committee. It was this investigation by the Local Human Rights Committee of plaintiffs' claims of patient abuse at the Hospital, as advanced by the ACLU, which brought the controversy between the plaintiffs and the Hospital to a climax.
 
 
 10
 In early June, the Committee began preparation for its hearing. Because plaintiffs' charges had prompted the investigation, the Committee conferred with the plaintiffs on the charges and the procedure to be followed when investigating the charges. The plaintiffs raised some objections to three members of the Committee; these members were replaced. The plaintiffs also complained that the Hospital was denying them access to various files needed by them for the presentation of their evidence. The Committee arranged for the plaintiffs to have access to such files. The plaintiffs then asserted they were having difficulty in copying the files. The Committee made available to plaintiffs facilities for copying the files in the offices of Professor Spaulding, the Committee's counsel. While the plaintiffs were engaged in the copying, some disagreement arose between them and Professor Spaulding. The plaintiffs thereupon raised objections to Professor Spaulding, claiming that there was a question of the legality of some arrangement between the Hospital and the Medical College of the University of Virginia and, since he was a professor at the University, they claimed Spaulding was disqualified. The Committee refused to dispense with Professor Spaulding's services.
 
 
 11
 Based on conversations with the plaintiffs and review of their records, the Committee prepared an agenda for the hearing, slated to commence on June 29, 1981. This agenda was forwarded to the plaintiffs. In the meantime, the Committee had invited public comment on the substance and procedure of the investigation. On the Sunday before the hearing was to commence on the following Monday, the plaintiffs had a meeting. They decided at the meeting that, though they were instigators of the investigation and were expected to be the main witnesses on the charges, they would refuse to testify at the hearing, confining themselves to the reading of a statement of their objections to the proceedings and to the Committee itself. It seems they also agreed that, if called as witnesses, they would refuse to testify, stating identical grounds for their refusal.[3]
 
 
 12
 When the hearing convened the next day the plaintiffs appeared and sought to read their statement critical of the Committee. This was disallowed. When asked to take the oath and testify they refused. The defendant Spaulding requested the defendant Burns, as the plaintiffs' superior, to instruct the employee-plaintiffs to testify since in effect they were the complainants. Burns so instructed them. The plaintiffs took the oath, but when they were questioned, they answered with what the district judge aptly characterized as a "modified prisoner-of-war" response, giving only their name and position at the Hospital as their answer to any question. In his deposition, Buschi, who had been detailing his story of patient abuse to the press, the ACLU, and no doubt to others, oddly asserted later that his "First Amendment rights were violated by the compulsion to testify at the hearing." He also contended that he had refused to testify because he said the investigation was a "whitewash," though he offered no support for such a broad charge. The defendant Burns suspended all the plaintiffs, including Buschi, pending an investigation to determine what, if any, disciplinary action would be appropriate as a result of this refusal to testify. As a result of the investigation it was determined on July 9, 1981, to terminate the plaintiffs Buschi, Draper, Vessey, and also Hardley.
 
 
 13
 The four other plaintiffs, Scott, Andrews, Tsatsios, and Wall, whose alleged insubordination had not at the time resulted in discharge, later engaged along with the other plaintiffs in what the administrator of the hospital and his staff regarded as a work-stoppage under a false claim of "sickness" and for this they were given notices of termination, which, of course, was subject to the usual provisions for hearing under the Commonwealth employee grievance procedures.
 
 
 14
 On July 9, the defendant Burns attempted to communicate with the plaintiffs for the purpose of discussing the disciplinary action to be taken against the four whose terminations were decided on July 9. The plaintiffs were unavailable for Burns' calls. The plaintiffs apparently were informed that Burns was attempting to reach them, though, for they all gathered in their attorney's office. Acting on their behalf, the attorney telephoned Burns that the plaintiffs were with him (the attorney), that it was understood that he (Burns) wanted to see them, and inquired the purpose of the interviews. Burns responded by telling the attorney the purpose of the interviews. The attorney asked whether the plaintiffs could come as a group, accompanied by their attorney. According to Burns, he replied that he would only interview each of the plaintiffs individually. The attorney responded, according to Burns, that under those circumstances they would not attend the interviews. According to the attorney, before stating that the plaintiffs would not attend the interviews, he queried whether anything the plaintiffs would say at the hearing would likely change the decision. When Burns responded, according to the attorney, that any statement by the employee-plaintiffs would not be expected to change the result, it was at that point, according to the attorney, that he told Burns that the plaintiffs would not appear for an interview and that the Hospital could provide the notices of charges and discharges to him on behalf of all the plaintiffs.
 
 
 15
 The plaintiffs filed their first complaint herein on July 20. Seven of the plaintiffs had pending at the time grievance proceedings under the state employee grievance procedures. Writing counsel for the Hospital, plaintiffs' attorney by letter dated July 27, 1981, formally abandoned these proceedings:
 
 
 16
 This is the letter I told you I would write you to confirm that the above-named employees of the Department of Mental Health and Mental Retardation wish to abandon any further proceedings available to them under the state's grievance system with respect to any grievances which have been filed by them and which have not been finally determined as of this date.
 
 
 17
 This case thereafter proceeded to trial on plaintiffs' first cause of action. After submission of the case to a jury, under instructions to which there are no objections except for the form of verdict to which we refer later, there was a verdict in favor of the defendants. It is from the judgment pursuant to that verdict that this appeal is taken. In so appealing, the plaintiffs have stated a number of exceptions, and we shall address them substantially in the order in which they are argued by the plaintiffs.
 
 I.
 
 18
 We follow the appellants in discussing first the plaintiffs' assignment of error on the part of the district judge in his ruling made in advance of trial and adhered to at trial that the truth or falsity of the plaintiffs' charges or statements "concerning problems of patient care and staff treatment" were not in issue at trial and that no evidence in that connection would be admitted unless offered for some purpose other than proof of its truth or falsity. In urging that such ruling was in error, the plaintiffs rely primarily on Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).
 
 
 19
 In Pickering, the Supreme Court recognized that the State's interests "in regulating the speech of its employees ... differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." In determining whether the employee's speech in a particular case is entitled to constitutional protection, the court must arrive "at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568, 88 S.Ct. at 1734. This rule, as refined in Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), establishes a two-step process for resolving whether an employee's speech qualifies for constitutional protection under the balancing test. As we said in Jurgensen v. Fairfax County, 745 F.2d 869, 878-79 (4th Cir.1984), the first or threshold step in this process calls for an affirmative answer to the "question whether the employee's speech or activity qualifies as 'a matter of public concern.' " Jurgensen, 745 F.2d at 879. This question is one of law, to be made by the court on "the content, form, and context" of the statement. Connick, 461 U.S. at 147-48 & n. 5, 103 S.Ct. at 1690 & n. 5. In that connection, the court is " 'compelled to examine [for itself] the statements in issue and the circumstances under which they are made to see whether or not they ... are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.' " Connick, at 150 n. 10, 103 S.Ct. at 1692 n. 10 (quoting Pennekamp v. Florida, 328 U.S. 331, 335, 66 S.Ct. 1029, 1031, 90 L.Ed. 1295 (1946) ). This was declared unequivocally in Lewis v. Blackburn, 759 F.2d 1171 (4th Cir.1985) (en banc), vacating the opinion of the majority in the panel opinion and adopting the dissenting opinion of Judge Ervin, 734 F.2d 1008-12 (4th Cir.1984) (Ervin, J. dissenting), wherein it was stated: "If the expression did not involve a matter of legitimate public concern, no first amendment protection against discharge existed and no balancing was needed." If the court finds that the speech or activity does not qualify for constitutional protection, discharge for such speech or activity will not be violative of the employee's constitutional free speech rights. If the speech or activity is found to qualify as "a matter of public concern," the court is required to proceed to the second step and, under it, to give "full consideration" to the effect of such speech or activity on the efficiency, discipline and proper administration of the agency. See Connick, 461 U.S. at 150, 103 S.Ct. at 1692, Jurgensen, 745 F.2d at 880.
 
 
 20
 In this case the district judge ruled that the speech and activity of the defendants presented matters of "public concern." He did this in his denial of the plaintiffs' motion for a partial summary judgment "[t]hat none of the plaintiffs' criticisms of Western State Hospital were knowingly false or were made with a reckless disregard for the truth." He repeated this ruling throughout the trial whenever it appeared that either side was trespassing into the area of truth or falsity of the "criticisms." He so ruled because "the state-employer has no greater power to limit the false statements of an employee than the truthful statements unless [the employer] can show that the employee's activities impeded the proper performance of his daily duties or interfered with the regular operation of his governmental bureau." Pilkington v. Bevilacqua, 439 F.Supp. 465, 473 (D.R.I.1977), aff'd without opinion, 590 F.2d 386 (1st Cir.1979). Pilkington, however, added in a footnote a citation to Pickering, wherein the court qualified its ruling that the falsity of the employee's statement is irrelevent: "But as to statements which were knowingly or recklessly false, the Court reserved decision, 391 U.S. at 574." [88 S.Ct. 1731 at 1737] Pilkington, 439 F.Supp. at 473 n. 5; see Pickering, 391 U.S. at 574 n. 6, 88 S.Ct. at 1738 n. 6. It was manifestly because of this cautionary note that the plaintiffs made their motion for a partial judgment in almost the exact language of note 6 in Pickering. In seeking a ruling that their statements were not "knowingly false or were made with reckless disregard of the truth," the plaintiffs made clear that in their view, any evidence of the truth or falsity of their "criticisms" was irrelevant for the purpose of establishing whether the plaintiffs' speech or activity qualified as a "matter of public concern."
 
 
 21
 It was accordingly unnecessary, in the proof of their case, for the plaintiffs to offer any evidence of the truth of their "criticisms" and, likewise the defendants had no right to seek to prove the falsity of the "criticisms." The question was simply one of law whether the statements, irrespective of their truth or falsity, raised a "matter of public concern." The district judge had ruled, however, that the statements were "matters of public concern." And, so far as we can discern, the district judge adhered strictly to this ruling throughout the trial. That left as the relevant question under Pickering and Connick whether such statements, though of public concern, could reasonably affect the efficiency, discipline or administration of the agency. Under the circumstances, the district judge kept the case focused on that specific issue in dispute and avoided encumbering the record with a mass of unnecessary evidence of the truth or falsity of the plaintiffs' statements or whether they had made the statements "knowingly or recklessly," matters which could well have diverted the jury from the real issues in the case and would have unduly prolonged the trial. In so doing, the district judge committed no error.
 
 II.
 
 22
 The plaintiffs would find error in the dismissal of certain defendants on motion for summary judgment. The defendants so dismissed fall into three groups which will be considered separately.
 
 A. Bradshaw and Spaulding
 
 23
 The defendant Bradshaw was the chairperson and the defendant Spaulding was the counsel of the Committee, which, under departmental regulations, was charged with participation in a conspiracy in their investigation of the charges of patient abuse leveled by the plaintiffs against the Hospital. Beyond actually conducting the hearing of such charges, these two defendants had no other participation with any of the parties herein or connection with the controversy under review. It is well settled that mere allegations of conspiracy, backed up by no factual showing of participation in a conspiracy, are insufficient to support such an action against a motion for summary judgment based on affidavits establishing the absence of any participation. Jafree v. Barber, 689 F.2d 640, 644 (7th Cir.1982); Kaylor v. Fields, 661 F.2d 1177, 1183 (8th Cir.1981); Cole v. Gray, 638 F.2d 804, 811 (5th Cir.) cert. denied, 454 U.S. 838, 102 S.Ct. 144, 70 L.Ed.2d 120 (1981); Slotnick v. Garfinkle, 632 F.2d 163, 165 (1st Cir.1980) (per curiam); Francis-Sobel v. University of Maine, 597 F.2d 15, 17, (1st Cir.), cert. denied, 444 U.S. 949, 100 S.Ct. 421, 62 L.Ed.2d 319 (1979). There is no direct proof of participation in any conspiracy by either Bradshaw or Spaulding, only the bare allegations of the complaint.
 
 
 24
 The plaintiffs do make a stab at attempting to tie circumstantially these defendants to their allegation of a conspiracy. They posit, for instance, that the defendant Bradshaw "[r]efused to allow the Plaintiffs to testify concerning problems at Western State." Presumably, this reference has to do with matters occurring at the hearing before the Committee over which the defendant Bradshaw as chairperson presided. It is sheer fatuity, though, for the plaintiffs to assert that Bradshaw refused to allow the plaintiffs to testify at such hearings. The plaintiffs were called as witnesses at the hearing; it was they who refused to testify about their allegations of patient care at the Hospital. It is possible that the claim of the plaintiffs is that they were not permitted to testify about their personal grievances which seemed to be of more concern to them than the treatment of patients by the Hospital. If that is their claim, there is perhaps some possible plausibility to such claim. The Committee did refuse to hear those grievances. But there was certainly no error in such a ruling. The Committee was created under proper Commonwealth regulations to investigate solely charges of patient abuse; it had no other authority. Any investigation of employee grievances is by state law differently provided for under a procedure laid out precisely under the law. See Va.Code Sec. 2.1-114.5:1 (Supp.1985). For the Committee to have intruded into the area of employee grievances would have been an improper and illegal encroachment on the grievance procedure created by statute for investigating such complaints.
 
 
 25
 The record is likewise devoid of any facts that would support a circumstantial finding of conspiratorial participation on the part of the defendant Spaulding. This defendant was on the faculty of the University of Virginia and, using this fact as a foundation, the plaintiffs suggest that he was disqualified by a conflict of interest in acting as counsel for the Committee in the investigation. The ground for such a contention is plaintiffs' contention that there was something (never alleged or disclosed) that was illegal in an agreement of cooperation between the Western State Hospital and the Medical School at the University of Virginia. Such an obscure contention, it seems to us, is too weak a reed on which to premise a finding of conspiratorial participation by a member of the University faculty. Another complaint advanced by the plaintiffs against the defendant Spaulding is that, when the plaintiffs, in what can only be viewed as an exhibition of studied contempt of the Committee and its attempt to investigate plaintiffs' own charges, mumbled a modification of the "prisoner-of-war" refusal to answer inquiries by the Committee, Spaulding suggested to the Hospital that the plaintiffs should be disciplined. We perceive in this conduct of the defendant Spaulding a spontaneous reaction to as obvious an act of insubordination as could be imagined. But, whether justified or not, the action of Spaulding evidences no conspiratorial conduct and cannot suffice to link him to any putative conspiracy with the Governor and some twenty-three other defendants to harass the plaintiffs.
 
 
 26
 In sum, we find no evidence linking either of these defendants to a conspiracy. We approve, therefore, the action of the district judge in dismissing Bradshaw and Spaulding as defendants on this ground and find no occasion to discuss whether such defendants should be held immune as quasi-judicial officers within the rationale of Ward v. Johnson, 690 F.2d 1098 (4th Cir.1982) (en banc ), as suggested by the district judge.B. O'Hare and Ware
 
 
 27
 The defendant O'Hare was an assistant Attorney General of the Commonwealth, whose responsibility in that office was to act as a legal advisor to the Department of Mental Health and Mental Retardation. The plaintiffs claimed that O'Hare had consulted with two officials of the Department and, as such, had "advance knowledge of and condoned the disciplinary actions taken against Mr. Buschi and Gary Hardley, despite the fact that these actions were taken in violation of state law." It is not claimed that O'Hare knew either Buschi or Hardley or that he had any bias against either. His good faith is not in question. There is no dispute that O'Hare consulted with the officers of the Department of Mental Health and Mental Retardation, as well as of the State Hospital. That was a part of his duties as an assistant Attorney General. An attorney who offers advice to his client without malice and in good faith, may not be liable. Yoggerst v. Stewart, 623 F.2d 35, 38 (7th Cir.1980). That case is strikingly similar on its facts to the situation of O'Hare in this case.
 
 
 28
 Yoggerst, a state employee, sued four officials in the State Office of Manpower and Human Development for wrongful discharge in violation of his free speech rights. Among those named as defendants was the defendant Stewart, the legal advisor to the Office. He had the responsibility of "giv[ing] legal counsel to any agency official on any subject matter relating to agency functions." He, however, had, just as O'Hare, "no legal authority to discipline" the plaintiff-employee. He had been consulted about what action was possible against the plaintiff by one of the officials in the agency, had later met with the officials in the agency on the matter of plaintiff's conduct, and had given them his opinion--precisely the position of O'Hare. The district court dismissed the claim against Stewart, and that ruling was affirmed on appeal, the Court of Appeals declaring:
 
 
 29
 Yoggerst's complaint fails to state a claim against Stewart. The complaint is silent with respect to what duties Stewart owed to plaintiff and how those duties were breached. Stewart did not exercise any "line" authority with respect to Yoggerst. His only involvement in the case consisted of the good faith offering of a legal opinion at the request of an official of GOMAHD, his client. Stewart was not the efficient cause of any injury to Yoggerst. An attorney, offering advice in good faith, is not liable for the torts of a client. 623 F.2d at 38.
 
 
 30
 The action of O'Hare was, as we have said, no different than that of Stewart. The plaintiffs actually point to no action on O'Hare's part which violated any established law. Nor have they sought, though they had extensively examined O'Hare in discovery proceedings, to take issue with O'Hare's own affidavit that, in his consultation with any of the officials of the Department he had acted in good faith and without any bias against the plaintiffs.
 
 
 31
 It is also posed that O'Hare in some way became involved when one of the plaintiffs sought legal advice from him. O'Hare refused to advise this plaintiff because it would have represented in his opinion a conflict with his duty of representation of the Hospital. We do not perceive a basis for faulting O'Hare for refusing to advise the plaintiffs in such circumstances. As the Court said in Petrou v. Hale, 43 N.C.App. 655, 661, 260 S.E.2d 130, 135 (1979), denied discretionary review, 299 N.C. 332, 265 S.E.2d 397 (1980), "[i]f an attorney whose primary duty is to promote the cause of his client in a light most favorable to him within the bounds of the law is also required to protect the rights of an adverse party, he will be caught in the midst of a conflict of interest." While O'Hare perhaps was not charged with the duty to promote the cause of the agency, he was obligated to advise the officials of that agency in their dealings with subordinate employees and it would have been improper for him to undertake at the same time to act as counsel for an employee in her controversy with the agency officials, especially where that employee was represented by competent counsel of her own choice.
 
 
 32
 The claim against Ware is even more tenuous. It is charged that he "[p]articipated in covering up improper research at Western State" and "[t]ook part in the harassment of Mr. Buschi in early March, 1981." Ware is the director of research in the Department of Mental Health and Mental Retardation. In March, 1981 he did go to Western State Hospital to investigate a charge by the plaintiff Buschi that "unauthorized research involving the drug Tegretol was being conducted at the WSH." He concluded on the basis of his analysis of the records "that Tegretol was being prescribed in a legitimate, therapeutic manner to increase control over seizure behavior and was not being prescribed for research purposes." In his analysis, Ware, according to his undisputed affidavit, employed "well-founded techniques to determine whether illegal research was being conducted at WSH." Specifically, he denied that he had engaged or participated in any cover-up or that he had participated in or knew of the plaintiffs' discharge until after the plaintiffs were discharged. There is no suggestion that this action by Ware was related in any way to the discharge of the plaintiffs. Nor do the plaintiffs contend to the contrary. It is obvious that there was no substance to plaintiffs' attack on Ware.
 
 
 33
 It is obvious that the district court correctly dismissed both O'Hare and Ware as defendants.
 
 
 34
 C. Governor Dalton, et al.
 
 
 35
 This group includes Governor Robb and Dr. Bevilacqua, neither of whom was in office at any time covered by the complaints herein. As the district judge said in dismissing these two as defendants, "[t]hey, obviously, can have had no connection with what went on before they took office." The suggestion that they were made parties in order that any injunctive relief might be enforced was found unnecessary. The other defendants who were dismissed in this group were state officials at the time involved herein without any "line responsibility" over employees or conditions at Western State Hospital and who had no involvement with the disciplining or discharge of the plaintiffs. All the defendants with "line responsibility" over conditions and employment at the Hospital or who could be said to have had authority to discipline employees at the Hospital (numbering 13) remained as defendants, were not dismissed on summary judgment, and continued as such throughout trial. In dismissing this former group of so-called "non-line" defendants, the district judge said that, since these defendants were charged only under an allegation of conspiracy involving acts done by them in the exercise of their duties as state officials, they were immune from liability under the intracorporate conspiracy doctrine, as stated and applied in Becker v. Russek, 518 F.Supp. 1040, 1045 (W.D.Va.1981), aff'd without opinion, 679 F.2d 876 (4th Cir.1982); Fowler v. Department of Education, 472 F.Supp. 121, 122 (E.D.Va.1978); Clark v. Louisa County School Board, 472 F.Supp. 321, 324 (E.D.Va.1979); and Buntin v. Board of Trustees, 548 F.Supp. 657, 660 (W.D.Va.1982).
 
 
 36
 The intracorporate conspiracy doctrine, as it is known in American law, grew out of the decision in Nelson Radio & Supply Co. v. Motorola, Inc., 200 F.2d 911 (5th Cir.1952), cert. denied, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953), an anti-trust case based on an alleged conspiracy between the defendant corporation and its officers, employees and agents. In that case, the Court dismissed the action, saying:
 
 
 37
 It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation. 200 F.2d at 914.
 
 
 38
 Nelson was, as we have said, an anti-trust action. The doctrine, however, has been applied in the civil rights area, Dombrowki v. Dowling, 459 F.2d 190, 196 (7th Cir.1972) (Stevens, J.); Herrmann v. Moore, 576 F.2d 453 (2d Cir.), cert. denied, 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 679 (1978); Becker v. Russek, 518 F.Supp. 1040, 1045 (W.D.Va.1981), aff'd without opinion 679 F.2d 876 (4th Cir.1982); Eggleston v. Prince Edward Volunteer Rescue Squad, Inc., 569 F.Supp. 1344, 1352 (E.D.Va.1983), aff'd without opinion, 742 F.2d 1448 (4th Cir.1984), involving "officials of a public body who act within the scope of their employment"); Legal Aid Society v. Ass'n. of Legal Aid Attorneys, 554 F.Supp. 758, 766 (S.D.N.Y.1982) (involving a union and its officers). In Herrmann, the plaintiff claimed his discharge as a tenured faculty member of the Brooklyn Law School faculty was the result of a conspiracy directed at him by the School, its trustees, and certain of its faculty because he was active in advocacy of increased rights for black students and faculty and because he had testified against the School in a lawsuit. The Court affirmed a dismissal of the plaintiff's section 1985(2) action, stating:
 
 
 39
 Everyone of the defendants who was involved in the so-called conspiracy was either a trustee or faculty member of the Brooklyn Law School--which is admittedly an educational corporation--and was acting in that capacity in connection with the discharge.
 
 
 40
 * * *
 
 
 41
 * * *
 
 
 42
 Inasmuch as in the case at bar the complained-of injury was the discharge of plaintiff by the corporation, and inasmuch as each of the persons shown to have any purpose to further the discharge was a trustee or employee of the corporation and acting for it, we agree with the District Judge's conclusion that with respect to plaintiff's claim based on 42 U.S.C. Sec. 1985(2) clause 1 defendants were entitled to summary judgment. 576 F.2d at 459 (footnote omitted).
 
 
 43
 Though the doctrine has been criticized, see Novotny v. Great American Federal Savings & Loan Ass'n, 584 F.2d 1235 (3d Cir.1978), vacated on other grounds, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979); Note, Intracorporate Conspiracies under 42 U.S.C. Sec. 1985(c), 92 Harv.L.Rev. 470 (1978); Note, Intracorporate Conspiracies under 42 U.S.C. Sec. 1985(c): The Impact of Novotory v. Great American Federal Savings & Loan Association, 13 Ga.L.Rev. 591 (1979), this intracorporate conspiracy doctrine was recognized and adopted by us in Greenville Publishing Co., Inc. v. Daily Reflector, Inc., 496 F.2d 391, 399 (4th Cir.1974); see also, Bellamy v. Mason's Stores, Inc., 508 F.2d 504, 508 (4th Cir.1974) (Boreman, J., concurring). Even more important, the doctrine has recently arisen in Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628, 642 (1984) (footnote omitted), where the Court, in summary, said in affirming the validity of the doctrine: "For these reasons, officers or employees of the same firm do not provide the plurality of actors imperative for a Sec. 1 conspiracy."
 
 
 44
 Nor is the immunity granted under the doctrine to the agents and the corporation destroyed because the agents are sued individually. As the Court in Cole v. University of Hartford, 391 F.Supp. 888, 893 (D.Conn.1975) put it: "Simply joining corporate officers as defendants in their individual capacities is not enough to make them persons separate from the corporation in legal contemplation. The plaintiff must also allege that they acted other than in the normal course of their corporate duties." This is not to say that there have not been exceptions to the doctrine in certain of the cases. Thus, it has been said that the doctrine is inapplicable "where the plaintiff has alleged that the corporate employees were dominated by personal motives or where their actions exceeded the bounds of their authority." Note, 13 Ga.L.Rev. at 608. We applied such an exception in Greenville Publishing, where, after stating that "[w]e agree with the general rule" as stated in the intracorporate conspiracy doctrine in Nelson Radio, we added that "an exception may be justified when the officer has an independent personal stake in achieving the corporation's illegal objective." 496 F.2d at 399. And in Hodgin v. Jefferson, 447 F.Supp. 804, 807 (D.Md.1978) (emphasis in original), it was held that "unauthorized acts [of an employee] in furtherance of a conspiracy may state a claim under Sec. 1983(3). Thus, while authorized acts of the officials would constitute corporate action, (and hence would avoid a conspiracy charge), unauthorized acts would not."[4]
 
 
 45
 The plaintiffs seem to have recognized, in the preparation of their complaints, the applicability in this case of the intracorporate conspiracy doctrine as a defense to certain of their claims. Thus, in their third cause of action which was purely a conspiracy claim under section 1985(3), they separated from the other defendants and specifically identified three defendants (Burns, Yank, and Colton) as defendants having "an independent personal stake in conspiring against the plaintiffs in that they were charged by the plaintiffs with patient abuse." By such allegation the plaintiffs in effect tracked the language of the Court in Greenville Publishing in its statement of an exception to the intracorporate conspiracy doctrine.
 
 
 46
 Though we find in the intracorporate conspiracy doctrine warrant for the dismissal of the identified defendants by the district judge, the dismissal was equally justified on the ground that, on the basis of the record made in the hearing on the motion for summary judgment, there was no showing of liability on the part of such defendants. In the appendix are the statements made in response to an interrogatory requiring the identification "in detail, and not in summary fashion" the claims against these defendants. We review these statements as they relate to one of these defendants who was dismissed, illustrative of the lack of proof of any substantive evidence of participation by these defendants in any conspiracy against the plaintiff.
 
 
 47
 In addressing this point, it is important to emphasize at the outset that there is no contention that any of these defendants were personally involved in the plaintiffs' discharge; it is contended merely that they engaged in "a campaign of intimidation and harassment" against the plaintiffs. In support of the latter charge, the plaintiffs, for instance, point to but two facts to establish participation by Governor Dalton whose case we discuss for illustration purposes. The first claim is that Governor Dalton "informed Mr. Wall's[5] representative that an investigation had shown no cause to believe there was race discrimination at Western State," a statement the plaintiffs assert to be false. The basis for this charge by the plaintiffs was that the plaintiff Wall's so-called "representative" who was the president of the Staunton-Augusta Branch of the NAACP had written the Governor on April 24, 1981, objecting to the appointment of the defendant Burns as administrator of the Western State Hospital and incidentally referring to a charge of racial discrimination, in which the writer suggested Burns was involved. The writer requested that the complaint be investigated and that until that was done, the defendant Burns be demoted to acting administrator. According to Governor Dalton's undisputed affidavit, he received such letter and, as was his custom, he referred it to the defendant Kirven, who was the head of the Department of Mental Health and Mental Retardation, with the request that he (the head of the Department) prepare a proper response for the Governor to such letter. The defendant Kirven prepared such a response, which said in the beginning that "an administrative investigation" had been conducted and that such investigation had found "no cause for your allegations of racial discrimination." The letter followed with the statement that the Department "requested that any charges of discrimination be filed through formal channels with either the State EEOC or Federal EEOC offices by the concerned employees." To this letter, the NAACP representative responded that he believed that the Governor had been "sorely misinformed" and that the claim of the Department of an "administrative investigation" was false. He also said that the two employees concerned in the charge of discrimination had already filed complaints with the EEOC and their complaints were being investigated. In his conduct in this regard, the defendant Dalton evidenced no bias against the plaintiffs, did nothing to harass them, and took no action contributing to the plaintiffs' discharge or discipline. Nor is there anything to show any participation on his part in any conspiracy against the plaintiffs.
 
 
 48
 Another charge directed at Governor Dalton was that certain parties, presumably plaintiffs, had complained to the Governor of harassment and he had not taken action on such complaints. A Governor of a State cannot be expected to investigate personally every complaint by a disgruntled employee. The most to be expected of him is to refer complaints to the respective department heads with the request that they, through departmental procedures, investigate the complaint. Governor Dalton's affidavit states that he followed this practice and his statement to this effect is not disputed. For the plain fact is that the Governor had no authority under state law to discipline employees. This right is controlled by state statutes, which gave the employees in this matter a remedy for wrongful action.
 
 
 49
 Finally, it is alleged in the complaint that Governor Dalton and two other state officials promulgated a policy "under which all employees of the Department were required to disassociate themselves from any position taken by the organization to which the employees belong if such position was in conflict with policies set by these defendants and by the Department." This policy, the plaintiffs allege, applied only for the period "from August through November, 1980." None of the problems complained of by the plaintiffs actually occurred during this period; they were all subsequent. Without inquiring further into this matter, it is clear that none of these charges against Governor Dalton has to do with the issues in this case, which involved, according to plaintiffs' complaint, allegations of harassment between April and July, 1981, and discharges in July, 1981.
 
 
 50
 We have reviewed in painstaking detail the actual charges against Governor Dalton. As is obvious, there is no merit in any of such charges and dismissal of him as a defendant was appropriate. The charges against the other defendants were equally meritless. To demonstrate their lack of substance would unduly extend this opinion; sufficeth that the charges against the other defendants who were dismissed by summary judgment were as lacking in substance and merit as those against Governor Dalton.
 
 III.
 
 51
 Plaintiffs' next allegation of error relates to the dismissal of their due process count. The due process claims of the plaintiffs were somewhat jumbled in both the complaints and in their affidavits filed in opposition to the defendants' motion for summary judgment. They appear to involve two separate violations. The first arose out of the alleged failure of the defendant Burns to afford the plaintiffs a pre-termination hearing; the second, as characterized by the plaintiffs in their brief in this court, consisted of actions "interfering with Plaintiffs' access to and use of the Virginia employee grievance procedure," these actions being, "spelled out in detail" in the plaintiffs' answers to defendants' interrogatories. We shall address these two claims separately, beginning with the first relating to the right of the plaintiffs to a pre-termination hearing.
 
 
 52
 It is undisputed that, when it was determined to terminate all the plaintiffs but Andrews and Vessey on July 9, 1981, because of their insubordinate conduct at the Committee hearing, the defendant Burns attempted to locate the plaintiffs and to give them an opportunity to be heard on the grounds on which they were being terminated. Advised that Burns was attempting to reach them, all the plaintiffs gathered in their attorney's office. Speaking for all the plaintiffs, their counsel called Burns in response to the latter's effort to reach the plaintiffs whom the Hospital proposed to terminate. Counsel explained he was representing all the plaintiffs and would speak for all of them. Burns told counsel he wished to see each of the plaintiffs who was subject to termination. The purpose of the interview was stated. It is the position of the defendants that counsel inquired whether the plaintiffs could come as a group with counsel. When Burns responded that he would only see the plaintiffs separately and without counsel, the defendants contend the plaintiffs said they would not participate in an interview under those circumstances. According to counsel's affidavit, he does not deny that the plaintiffs demanded the right to attend as a group with their counsel, but he asserts that he inquired of Burns whether whatever the plaintiffs may offer in excuse would change the decision to terminate and, when Burns replied in the negative, he told Burns the plaintiffs (referring to all the plaintiffs) did not wish an interview under those circumstances. On this record, the plaintiffs, although tendered a pre-termination interview, contend that they were denied their due process pre-termination rights to a hearing.[6]
 
 
 53
 There was long considerable doubt whether a public employee enjoys a right to some sort of pre-termination hearing. It is clear that at the time of plaintiffs' discharge and at the time of the district court's ruling herein the law was unquestionably assumed to be that it was unnecessary to accord a Virginia public employee a pre-termination hearing. It had been generally understood in this Circuit that, where there was an adequate post-hearing remedy available for public employees who were discharged, as there was in Virginia, a pre-termination hearing was not required. That was expressly so held in Detweiler v. Virginia Department of Rehabilitative Services, 705 F.2d 557, 560 (4th Cir.1983):
 
 
 54
 Detweiler's claim that he was entitled to a pretermination hearing has been foreclosed by Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. [1633] at 1635. [40 L.Ed.2d 15, (1974).] There a majority of the Court, although assigning different reasons, held that a post-discharge hearing suffices. Here, as in Arnett, the hearing panel is authorized to order reinstatement with back pay and benefits if it finds that the discharge was unjustified. Accordingly, the Virginia grievance procedure afforded Detweiler due process by assuring him a post-discharge hearing with an adequate remedy.
 
 
 55
 However, on March 19, 1985, the Supreme Court in Cleveland Board of Education v. Loudermill, --- U.S. ----, ----, 105 S.Ct. 1487, 1493-94, 84 L.Ed.2d 494, 504 (1985), held that an employee who has a constitutionally protected property interest in his employment, which a Virginia public employee was said in Detweiler to have, is entitled to "some kind of a hearing" prior to discharge.[7] Such hearing "need not be elaborate" since the hearing "need not definitely resolve the propriety of the discharge." The extent of a public employee's right to a pre-termination hearing, according to the Court, was "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." --- U.S. ----, 105 S.Ct. at 1495. 84 L.Ed.2d at 506. Anything more than this, the Court declared, "would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." Id.
 
 
 56
 The defendant Burns, of course, did not have the benefit of Loudermill when he was preparing to terminate the employment of the plaintiffs. However, in our opinion he met the requirements of a pre-termination interview as stated in that case. The evidence is conclusive that Burns offered the plaintiffs individual interviews. The plaintiffs rejected this offer and made a counter-offer. Burns was not obligated to accept their counter-offer. His forecast of the outcome of the interviews did not foreclose the plaintiffs' rights. In sum, Burns did all that was required by Loudermill and this forecloses any relief in favor of the plaintiffs under this due process claim.
 
 
 57
 Moreover, it is beyond dispute that at the time of these discharges, which predated the decision in Loudermill, the law in this Circuit was plainly understood not to require a pre-termination hearing. This, as we have said, is clear from Detweiler. A public official is entitled to qualified immunity for his actions if such actions do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known" at the time. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1980). The question whether a defendant is entitled to a qualified immunity is, as the Supreme Court recently said in Mitchell v. Forsyth, --- U.S. ----, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985), "a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, in cases where the district court has denied summary judgment for the defendant on the ground that even under the defendant's version of the facts the defendant's conduct violated clearly established law, whether the law clearly proscribed the actions the defendant claims he took." In a footnote to this language, the Court added: "We emphasize at this point that the appealable issue is a purely legal one, whether the facts alleged (by the plaintiff or, in some cases, the defendant) support a claim of violation of clearly established law." 105 S.Ct. at 2816 n. 9. Even if it could be argued that Burns discharged the plaintiffs without affording them a pre-termination hearing, the defendants were entitled to a grant of summary judgment in their favor against any recovery of damages by the plaintiffs because such failure to grant a pre-termination hearing was not at the time in violation of clearly established law; and, as the Court said in Mitchell, it is "appropriate" for us to sustain this defense "notwithstanding that it was not addressed" by the district court. 105 S.Ct. at 2817.[8]
 
 
 58
 The plaintiffs' other claim of a due process violation is covered by an allegation of a denial of access to the state grievance procedures and an interference in the processing of grievances filed under such procedures. This claim is long on accusatory adjectives but short on substantive facts. Most of the plaintiffs' various complaints had nothing to do with the filing or processing of employees' grievances; they primarily dealt with administrative practices at the Hospital, with patient treatment, and assertions of patient abuse. The plaintiffs, in their brief in this Court, have stated that the instances where they were denied access to state grievance procedures or were interfered with in their exercise of their rights under such procedures were set forth on pages 174 to 176 in the Appendix. There is no instance identified in that catalogue where any plaintiff was denied the right of "access" to the grievance procedures, save in one instance where the action taken was non-disciplinary and thus not grievable. The actual grievances listed by the plaintiffs in the indicated pages of the Appendix related to the plaintiff Buschi and primarily to the processing of a single grievance, i.e., that involving the May 1 instance.
 
 
 59
 The alleged "interferences" by the defendants with the processing of plaintiffs' grievances were almost entirely nitpicking. Buschi complained, for instance, that he was misled as to the time within which he must identify his panel representative under the grievance proceedings. However, it seems Buschi appointed his representative on the panel; his representative sat on the panel and joined in a decision in favor of Buschi. Another complaint of Buschi was that at the July 9 panel hearing on his May 1 grievance, a reporter present at the hearing was required to withdraw from the hearing at the instance of the defendant Burns, who was acting on the authority of a letter from the director of the Office of Employee Relations Counselors. The director, by law, is to advise on the conduct of grievance procedures. As a result of Buschi's objection, that ruling was reversed and "the propriety of attendance at the hearing of persons not having a direct interest in the hearing" was referred to the hearing panel for decision and the hearing reopened. Without pursuing the grievance procedures, and having the public present at the hearings, however, Buschi and the other plaintiffs, through their attorney, "abandon[ed] any further proceedings available to them under the State's grievance system with respect to any grievances which have been filed by them and which have not been finally determined as of this date." That, it would seem, made all these claims moot. We are unable, therefore, to perceive in this record any violation of the plaintiffs' due process rights.
 
 IV.
 
 60
 In their third count, the plaintiffs seek to state a cause of action under 42 U.S.C. Sec. 1985(3). The district judge dismissed the count on motion for summary judgment both on the ground that, under the intracorporate conspiracy doctrine, there was "no basis for a charge of conspiracy" and on the ground that there was "no showing in the matters before the Court of any disparity in the treatment of these employees." We agree with the dismissal, though not entirely on the grounds assigned by the district judge.
 
 
 61
 An action under section 1985(3) consists of these essential elements: (1) A conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus, to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy. See United Brotherhood of Carpenters v. Scott, 463 U.S. 825, 828-29, 103 S.Ct. 3352, 3355-56, 77 L.Ed.2d 1049 (1983); Griffin v. Breckenridge, 403 U.S. 88, 102-03, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971); Ward v. Connor, 657 F.2d 45, 47 n. 2 (4th Cir.1981).[9] To meet the requirement of a class-based discriminatory animus, under this section the class must possess the "discrete, insular and immutable characteristics comparable to those characterizing classes such as race, national origin and sex." Bellamy v. Mason's Stores, Inc., 368 F.Supp. 1025, 1028 (E.D.Va.1973), aff'd, 508 F.2d 504 (4th Cir.1974). In fact it was stated in Griffin, and repeated more explicitly by Justice White in United Brotherhood of Carpenters v. Scott, 463 U.S. at 836, 103 S.Ct. at 3359, "it is a close question whether Sec. 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause, most notably Republicans.... The predominant purpose of Sec. 1985(3) was to combat the prevalent animus against Negroes and their supporters."[10] Even Justice Blackmun, dissenting in Scott for what he saw as "the crabbed and uninformed reading" by the majority of section 1985(3), would limit the scope of the section to providing "a federal remedy for all classes that seek to exercise their legal rights in unprotected circumstances similar to those of the victims of Klan violence" and to conspiracies involving "invidious animus toward a class of persons" who did not enjoy "the possibility of [in]effective state enforcement" of their rights. 463 U.S. at 851, 103 S.Ct. at 3367. (emphasis in original). It is obvious that, whether we take the majority or the dissenting view in Scott, the class protected can extend no further than to those classes of persons who are, so far as the enforcement of their rights is concerned, "in unprotected circumstances similar to those of the victims of Klan violence." 463 U.S. at 851, 103 S.Ct. at 3367.
 
 
 62
 We recognize that there are a number of cases, many of which are cited in our recent case of Harrison v. KVAT Food Management, Inc., 766 F.2d 155 (4th Cir.1985), that take an expansive view of the scope of section 1985(3). Measured by the construction given the statute in Scott, however, it is doubtful that the expansive view of the statute reflected in some of these cases could be considered of continued precedential reliability.
 
 
 63
 In any event, we do not think that "whistleblowers" can be said to qualify as a class entitled to the benefits of section 1985(3). "Whistleblowers" do not meet the test of possessing "characteristics comparable to those characterizing classes such as race, national origin, and sex." Nor can they be said to be in "unprotected circumstances." As we recognized in another case arising in Virginia, a "whistleblower" may, like any other state employee, seek protection from a discharge in retaliation for his exercise of his rights of free speech. See Jurgensen v. Fairfax, 745 F.2d 868 (4th Cir.1984). In that case, we treated the claim of the "whistleblower" as one under the first amendment just as it would have been for any other state employee. There was not, therefore, any unequal treatment, as the district judge held, and accordingly there was no section 1985(3) violation which finds its basis in the equal protection clause.
 
 
 64
 It is true that in Lapin v. Taylor, 475 F.Supp. 446 (D.Hawaii 1979), the court sustained the claim of "a federal employee whistleblower" as a valid action under Sec. 1985(3). We do not find its reasoning persuasive. In reaching the conclusion it did, the court began with the premise "that the coverage of Sec. 1985(3) is to be determined by the 'principle underlying its adoption: the Governmental determination that some groups require and warrant special federal assistance in protecting their civil rights' ". Id. at 449 (quoting DeSantis v. Pacific Telephone & Telegraph Co., 608 F.2d 327, 331 (9th Cir.1979) ). It next held that the "Governmental determination" that a group warranted "special federal assistance" was one which could "be made by either the federal courts or Congress." Id. It concluded by finding in 5 U.S.C. Secs. 1201-09 (1978), which created the Merit Systems Protection Board and gave certain rights to "whistleblowers," the necessary "Governmental determination" essential to creating a right of action under section 1985(3). Without inquiring whether this result can be squared with Borrell v. United States International Communications Agency, 682 F.2d 981, 987 (D.C.Cir.1982), which found no private right of action for "whistleblowers" under sections 1201-09, it seems sufficient that the court in Lapin was careful to point out that its decision did not apply to persons not employed by the federal government and accordingly is without application in this case. Thus, in note 11, it said:
 
 
 65
 This decision specifically does not address the question of whether whistle blowers who are not employed by the federal government are within the ambit of Sec. 1985(3) protection. In order to satisfy the Ninth Circuit test, it will be necessary for them to find another "Governmental determination" that they need special federal protection of their civil rights because the Civil Rights Reform Act of 1978 does not extend to them. Furthermore, the constitutional justification for such an interpretation of Sec. 1985(3) probably could not be derived from the Congressional authority to enact that Civil Service legislation. 475 F.Supp. at 450 n. 11.
 
 
 66
 It follows that the district judge, as we have said, correctly dismissed this count and, since count four depended on a favorable ruling under section 1985(3), that count fell also with the dismissal of the third count.
 
 V.
 
 67
 Plaintiffs' counts five, six and seven may be quickly disposed of. Count five seeks to state a pendent state action under Va.Code Secs. 18.2-499 and -500. As set forth in their complaint, the count asserts an action for treble damages for injury to the professional reputation of the plaintiffs--in essence, an action in slander and libel. They make no claim of a business-related injury; their claim relates to their employment and possible injury to their employment reputation. In an unbroken line of federal district cases, beginning with Judge Mehrige's opinion in Federated Graphics Companies, Inc. v. Napotnik, 424 F.Supp. 291, 293-94 (E.D.Va.1976) and continuing as late as Nationwide Mutual Fire Insurance Co. v. Jones, 577 F.Supp. 968, 969-70 (W.D.Va.1984), the federal district courts in Virginia have consistently held that a right of action is "afforded [under these statutes] only when malicious conduct is directed at one's business, not one's person,"[11] and that the statute "focuses upon conduct directed at property, i.e., one's business"[12] and applies only to "conspiracies resulting in business-related damages."[13] The clear thrust of those cases is, as two commentators have said, that "[t]he employment relation [is to] be characterized as a personal right as opposed to a business interest" and is without the ambit of these state statutes.[14] This was made clear in Campbell v. Board of Supervisors, 553 F.Supp. 644, 645 (E.D.Va.1982), where the court said "[t]he section (i.e., Sec. 18.2-500) which was the only one giving a civil remedy) is aimed at conduct which injures a 'business' " and the statute is to be "construed to exclude employment from its scope."
 
 VI.
 
 68
 In their sixth and seventh counts the plaintiffs assert a right of action because of patient abuse at the Hospital by the defendants. In these counts, the plaintiffs seek no relief against such alleged abuse, either by a declaratory judgment or an injunction, on behalf of the patients, who are the persons injured by such abuse, if abuse there was. The basis of their cause of action is that they, by their complaints about the abuse, "lost their jobs and their chances to find other work in their profession." The remedy they seek is monetary damages--for themselves, not the patients who suffered injury, if there was any injury, from the alleged abuse. In essence, the plaintiffs seek to do just what the Supreme Court in Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) said they could not do:
 
 
 69
 [T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim for relief on the legal rights or interests of third parties.
 
 
 70
 Moreover, it is not necessary for the plaintiffs to seek to piggy-back their right to recover for publicizing alleged patient abuse as they had in these counts on a claim of injury suffered by the hospital patients; they had such a right of action under the First Amendment, as applied in Pickering and Connick. In fact, they have asserted that right in their first count and the district judge ordered that count to trial.
 
 
 71
 The plaintiffs, however, assert that they have standing to recover in these counts under Singleton v. Wulff, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). As Justice Brennan said in the recent case of South Carolina v. Regan, 465 U.S. 367, ----, 104 S.Ct. 1107, 1115-16, 79 L.Ed.2d 372, 383 (1984), Singleton v. Wulff represents "the exception rather than the rule." It is one in a line of abortion cases, in which the right of the physician to challenge anti-abortion statutes which denied reimbursement of the physician for abortions performed was reviewed. See, e.g., Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973). In Singleton Justice Blackmun, who wrote for four of the Justices, was careful to make out the exceptional character of the standing ruling on the right of the physician to assert jus tertii. He added, in answer to Justice Powell's criticism, this cautionary language:
 
 
 72
 Unless the "provider of services" that he has in mind enjoys with his "client" a confidential relationship such as that of doctor and patient, unless the "client's" claim is imminently moot, as the pregnant woman's technically is, the standing issue in such a future case will not be definitely controlled by this one. 428 U.S. at 119 n. 7, 96 S.Ct. at 2876 n. 7.
 
 
 73
 Further, Justice Stevens, whose vote was essential to the favorable resolution of the standing issue (without his vote the decision would have been 4-4), stated separately and differently his ground for sustaining jurisdiction:
 
 
 74
 In this case, (1) the plaintiff-physicians have a financial stake in the outcome of the litigation, and (2) they claim that the statute impairs their own constitutional rights. They therefore clearly have standing to bring this action.
 
 
 75
 428 U.S. at 121, 96 S.Ct. at 2877 (Stevens, J., concurring in part).
 
 
 76
 The plaintiffs in this case cannot qualify under the exceptional standard stated by Justice Blackmun or the rationale expressed by Justice Stevens in Singleton. Their claim of standing is foreclosed by this language of the Supreme Court later in Valley Forge Christian College v. Americans United, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (footnote omitted):
 
 
 77
 A recent line of decisions, however, has resolved that ambiguity, at least to the following extent: at an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976).
 
 
 78
 Even if the defendants have been guilty of patient abuse, the plaintiffs have not suffered any actual injury, only the patient has suffered injury; even if the plaintiffs were to recover monetary damages, the injury to the patients, if any, would not have been "redressed." If it had been the purpose of the plaintiffs to redress the patients' rights, they would have sought some form of injunctive relief in favor of the patients, as the plaintiffs did in Singleton and Bolton; the only relief the plaintiffs have sought, as we have said, is monetary relief for themselves. We have no doubt of the correctness of the district judge's decision to dismiss these claims of the plaintiffs.
 
 VII.
 
 79
 Finally, the plaintiffs who, after trial before a jury, suffered an unfavorable verdict at the hands of the jury, have raised an odd objection to the verdict form used by the district judge. Prior to trial, the district court had bifurcated the trial by separating the issue of liability and the issue of damages. The trial proceeded on the issue of liability. At the conclusion of the trial the plaintiffs proposed that the district judge should withhold "the issue of the defense of good faith immunity from the jury until the damage portion of the trial." The district judge, however, determined, in his discretion, to submit the cause to the jury on a general verdict form.[15] This was a matter within the district judge's discretion and we find no error.
 
 CONCLUSION
 
 80
 We have examined all the exceptions raised by the plaintiffs. We find no merit in any of them and, accordingly, affirm the judgment below.
 
 
 81
 AFFIRMED.
 
 
 
 [1]
 Hardley was an original plaintiff with the other seven. His case, however, was severed from that of the others and his claim that his discharge was for the exercise of his first amendment rights and in violation of his due process rights has been tried, resulting in a judgment in favor of the defendants. That judgment was affirmed by us on appeal in an unpublished opinion. Hardley v. Burns, 732 F.2d 150 (4th Cir.1984)
 
 
 [2]
 In his testimony on deposition, Buschi testified that in pressing for the investigation, the ACLU manager was acting as his attorney. Actually, he refused at one point in the proceeding to testify about certain of his contacts with the ACLU representative, citing the attorney-client privilege
 
 
 [3]
 In his deposition, Buschi denied that these actions of the plaintiffs at the hearing were "concerted." The actual conduct of the plaintiffs, their uniform response to the demand that they testify, was evidence of concert which made their denial of prior agreement incredible
 
 
 [4]
 This exception is less well recognized than the one followed in Greenville Publishing
 
 
 [5]
 Wall was a plaintiff in the action
 
 
 [6]
 As stated, Burns was on the 9th seeking to communicate with all the plaintiffs except Andrews and Vessey, but, when Burns had his conversation with plaintiffs' counsel, the latter stated he was speaking for all the plaintiffs. Under those circumstances, the declination by counsel for all the plaintiffs for any pre-termination hearing embraced Andrews and Vessey, even though at the time Burns was not seeking to reach those two
 
 
 [7]
 Robertson v. Rogers, 679 F.2d 1090 (4th Cir.1982), on which the district court relied for its ruling, dealt with a situation where there was no statute giving rise to a protected property interest in favor of a non-probationary employee in his job. Detweiler, however, held that the Virginia statutes did create such a right but that neither such statutes nor the federal Constitution required a pre-termination hearing
 
 
 [8]
 In Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2826, 2877, 49 L.Ed.2d 826 (1976), the Supreme Court said:
 The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the court of appeals, to be exercised on the facts of individual cases.... Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, ... [as] where "injustice might otherwise result." (quoting Hormel v. Helvering, 312 U.S. 552, 557, [61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941) ).
 
 
 [9]
 For a carefully documented history of section 1985(3) see Harrison v. KVAT Food Management, Inc., 766 F.2d 155 (4th Cir.1985)
 
 
 [10]
 A recent commentator has said that "[t]he Supreme Court [in Scott ] ... intimated that the section [section 1983(3) ] reaches only conspiracies motivated by racial bias." Note, 170 Cornell L.Rev. 756, 764 (1985)
 
 
 [11]
 Moore v. Allied Chemical Corp., 480 F.Supp. 364, 375 (E.D.Va.1979) (emphasis in original)
 
 
 [12]
 Federated Graphics, 424 F.Supp. at 294
 
 
 [13]
 Ward v. Connor, 495 F.Supp. 434, 439 (E.D.Va.1980), reversed on other grounds, 657 F.2d 45 (4th Cir.1981), cert. denied, 455 U.S. 907, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982)
 
 
 [14]
 Ulrich & Howard, Injuries to Business under the Virginia Conspiracy Statute: A Sleeping Giant, 38 Wash. & Lee L.Rev. 377, 385 (1981)
 
 
 [15]
 It seems that, under plaintiffs' theory, immunity is not an issue in connection with "liability" but is one exclusively for consideration on the "damage" issue. We are not persuaded by such an argument. See Mitchell v. Forsyth, --- U.S. ----, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) (immunity is in part immunity from being forced to defend one's actions in litigation)