**Dr. Jan KEMP, Plaintiff,**

v.

**Leroy ERVIN, individually and in his official capacity as Assistant Vice President for Academic Affairs and Director, Developmental Studies and Virginia Trotter, individually and in her official capacity as Vice President of Academic Affairs, Defendants.**

**Civ. A. No. C83–330A.**

United States District Court,
N.D. Georgia,
Atlanta Division.

April 22, 1986.

Joseph Pat Nelson, J. Hue Henry, Athens, Ga., for plaintiff.

Michael J. Bowers, Atty. Gen., Patrick W. McKee, Asst. Atty. Gen., H. Perry Michael, First Asst. Atty. Gen., O. Hale Almand, Sp. Asst. Atty. Gen., Atlanta, Ga., for defendants.

## ORDER AND MEMORANDUM ON MOTION FOR A NEW TRIAL

HORACE T. WARD, District Judge.

The above matter is again before the court on the motion of defendants Virginia Trotter and Leroy Ervin for a new trial. In the motion, the defendants assert that the court should vacate the verdict and judgment thereon and grant a new trial. In the alternative, the defendants move the court to grant a new trial as to damages in the event the court finds that the liability determination is untainted. Further, in the

event neither of the first two requests of defendants is granted, the defendants contend that the punitive damages awarded by the jury is shockingly excessive and that the court should grant a conditional remittitur of the punitive damages award. Although the issues involved on the motion for a new trial were extensively briefed, a hearing was held at which time oral arguments were made, with the court taking the matter under advisement.

## I. FACTUAL STATEMENT

This case originated with the filing by the plaintiff of an action against the defendants under 42 U.S.C. § 1983 for monetary damages, attorneys' fees and for declaratory and injunctive relief. The plaintiff was at all times relevant to her lawsuit an Assistant Professor of English (and for a time Coordinator of the English Component) in the Division of Developmental Studies at the University of Georgia. The defendants originally included the Board of Regents of the University System of Georgia, but prior to trial the Board of Regents was dismissed as a party. The defendants at the time of trial and judgment consisted of two administrators at the University of Georgia. One defendant is Dr. LeRoy Ervin, Director of the Division of Developmental Studies and Assistant Vice President for Academic Affairs. The other defendant is Dr. Virginia Trotter, who served as the Vice President of Academic Affairs for the University of Georgia.

Plaintiff contends that she was deprived of her employment and other employment benefits because of the exercise of the freedom of speech rights secured to her by the First and Fourteenth Amendments of the Constitution of the United States. The plaintiff demanded a jury trial and the case was tried before a court and jury, with the trial time covering approximately six weeks. The jury determined that the plaintiff's first amendment rights of free speech were violated in the job actions taken against her and that both defendants were involved.

In its verdict, the jury awarded the total of $2,579,681.95 in terms of compensatory and punitive damages. In specific details, the compensatory damages awarded against both defendants were as follows: $79,680.95 as lost wages, $200,000 for mental distress, and $1.00 for loss of professional reputation. Punitive damages were awarded against defendant Trotter in the amount of $1.5 million dollars and against defendant Ervin in the amount of $800,000.

It was the contention of the plaintiff that defendants Ervin and Trotter took several adverse employment actions against her in violation of her constitutional rights to freedom of speech secured by the first amendment. Specifically, plaintiff contended that she was relieved of all committee chairmanships, demoted from the position as Coordinator of the English component, and was ultimately terminated from her position as a nontenured professor in retaliation for engaging in protected speech activities. Among the speech activities asserted by the plaintiff were the following: participation in a student disciplinary hearing concerning an obscene phone call made to her by a student, protest to her supervisors and others because of the exiting of nine student athletes who had not met exit qualifications, and participation in an administrative hearing in which she challenged her removal as English Coordinator.

To the contrary, defendants denied that any of the employment actions taken with respect to the plaintiff were in retaliation for her exercise of protected free speech, or that her speech activities constituted a substantial or motivating factor in any of the employment decisions taken with regard to the plaintiff. Defendants further contend that there was a factual basis for all employment decisions made regarding the plaintiff, and that these actions would have been taken without regard to plaintiff's outspokenness. Also, defendant Virginia Trotter contended that she was not directly involved in any of the employment decisions taken with regard to the plaintiff.

Only a small portion of the evidence presented at the long trial will be set out

here. Other significant portions will be dealt with in a limited manner hereinafter in this Opinion as various legal issues are discussed. The plaintiff, who held an Ed.D. degree from the University of Georgia at the time of her severance, had been employed as a teacher in the Division of Developmental Studies at the University from 1976 until the non-renewal of her contract at the conclusion of the 1982–83 academic year. She served as an English instructor, was promoted to the rank of assistant professor in 1980, and served as the coordinator of the English component within the Department until her removal from that position in February 1982. Dr. Leroy Ervin, as Director of the Division of Developmental Studies, was the plaintiff's immediate supervisor. The Division of Developmental Studies at all times relevant to the issues raised in this case was not a part of or supervised by any of the regular academic departments or schools of the University of Georgia. Dr. Ervin reported directly to Dr. Virginia Trotter, who was his supervisor.

The Division of Developmental Studies was not one of the regular academic units of the University of Georgia, and was established and maintained for the purpose of being an educational unit to which incoming high school graduates who were not ready or who could not meet the qualifications for regular University admission would be admitted. These students generally remained in Developmental Studies until they met the requirements to enter the regular college program. Rather than being promoted to the regular college program, they were "exited" from Developmental Studies if they met the requirements. Otherwise, they were dismissed from the University. On occasion, certain students who were enrolled in regular college programs were admitted to Developmental Studies for brief periods of time to participate in certain courses. The Division of Developmental Studies consisted of three main components: Mathematics, English and Reading, together with research and counseling services. Each of the three units was headed by a coordinator.

In the fall of 1982 the plaintiff insisted on bringing a student before the student disciplinary hearing to determine whether he had made an obscene phone call to her, and participated in the hearing. For various reasons, Dr. Ervin sought to persuade the plaintiff from pressing the charges before the student judiciary. Shortly thereafter, the plaintiff was removed from the chairmanship of the Promotion and Tenure Committee. Around the conclusion of the fall 1981 quarter, nine (9) student athletes were "exited" from the developmental studies program into the regular University curriculum, though each had received a "D" in English during their fourth quarter. Simultaneously, at least one non-athlete student who had received a "D" in English during the fourth quarter was dismissed from the University. The nine athletes were administratively exited by defendant Trotter by virtue of authority vested in her as Vice President of Academic Affairs.

It is clear from the evidence that the exiting of the nine students was in contravention of University policy that required that students within the program achieve a minimum grade of "C" in English during the fourth and final quarter of the program. A number of faculty members decided to protest this decision, and the plaintiff was in the forefront of the protest. Plaintiff drafted a strong proposed letter to be directed to defendant Trotter and openly stated her views to the committee. An ad hoc faculty committee met with defendant Trotter as a part of the protest. Although a member of the committee, the plaintiff was unable to attend. Shortly after plaintiff's participation in the faculty protest of the exiting of the nine students, defendant Ervin removed her from the position as Coordinator of English in the division, which led to a change in her contract from 12 months to 9 months. Thereafter, the plaintiff pursued an administrative grievance within the University of Georgia seeking redress for her removal from the position of Coordinator of the English component. At the hearing she was represented by Mr. Larry Blount, a member of the

University of Georgia School of Law faculty. Defendant Trotter appointed a hearing tribunal, consisting of herself and two other vice presidents, to hear the plaintiff's complaint. There is conflict in the evidence as to what the authority of the tribunal was, and as to the nature of plaintiff's appeal. It is clear that the plaintiff's perception of her endeavor was that she was seeking a review of the merits of her grievance in an effort to have the action of defendant Ervin changed. The tribunal simply reviewed the procedure which defendant Ervin applied to effect plaintiff's removal and found that the procedure was appropriate. Following the hearing and as a result of a telephone conversation with plaintiff's attorney, Dr. Trotter prepared a written memorandum in which she underlined the statement that Dr. Kemp "is threatening to go public." The evidence further reveals that defendant Ervin attended the hearing before the tribunal, at which time he demonstrated his disagreement and hostility toward plaintiff's presentation. During the latter part of the summer of 1982, defendant Ervin notified Dr. Kemp in writing that he was recommending that her contract of employment not be renewed for the academic year 1983–84. One witness testified that Dr. Ervin told her that he was going to get rid of the plaintiff. Dr. Ervin denied that he made this statement.

Testimony of Dr. Trotter at a prior hearing was read into the record in which she testified about her knowledge and concurrence with the action taken by Dr. Ervin. She stated that his recommendation to nonrenew plaintiff's contract was reviewed and approved by her. Although Dr. Ervin did not specifically testify that he asked for the approval or concurrence of Dr. Trotter, he testified that he informed her of his decision to remove Dr. Kemp from English Coordinator and to recommend non-renewal of her employment contract with the University prior to taking those actions. Also, the plaintiff introduced certain notes made by Dr. Trotter in relation to the ad hoc committee meeting. These notes were highly critical of Dr. Kemp, a matter that was not the subject matter of the meeting.

The evidence in the record supports a finding of various aspects of preferential treatment given to revenue producing athletes (scholarship athletes), particularly in the relaxing of admission standards and, to some extent, efforts to maintain their enrollment for extended periods of time during their period of eligibility. Plaintiff testified that, during a dispute about a student athlete, defendant Ervin inquired of her as to whom did she think was more important to the University—a star basketball player or the plaintiff.

The defendants contended that there was no causal connection between the employment actions taken regarding the plaintiff and her outspokenness as to student athletes or otherwise. The defendants submitted evidence in an effort to show that they would have demoted and dismissed Dr. Kemp notwithstanding her exercise of first amendment rights. Defendants sought to prove that the plaintiff did not participate in research, was insubordinate and had difficulty in getting along with her peers and others. Defendants further sought to show that there was no reasonable likelihood that she would be tenured and that the fair thing to do, from an academic point of view, was to nonrenew her contract at the finding that the plaintiff's research efforts might not have satisfied the University requirement for research as a tenure requirement, there was testimony that it should have been considered as a scholarly activity. Also, the evidence showed widespread disagreement as to the research required of members of the faculty in Developmental Studies, as this was primarily a teaching unit. While the evidence is sufficient to support a finding that the plaintiff was often caustic and argumentative, it was conceded by the defendants that she was an excellent English teacher.

## II.  DISCUSSION AND CONCLUSIONS OF LAW

### A.  Motion for a New Trial

In support of their motion for a new trial, defendants contend that significant

prejudicial legal errors were made in determination of both the liability of and the damages against the defendants, and that they are thereby entitled to a new trial in this case. In their brief and by way of oral argument, defendants set forth various grounds. It was asserted that the court erroneously admitted evidence of the treatment of athletes at the University of Georgia, allowing the passion of the jury to be incited against defendants Ervin and Trotter and resulting in a shockingly excessive damage award which was directed toward the University of Georgia and the Athletic Association. It was further asserted that the court erroneously withdrew from the jury the affirmative defense of the defendants, resulting in an erroneous determination of their liability. Also included among the contentions was the argument that the jury verdict resulted from confusion of the jury and improper closing argument made by counsel for the plaintiff.

The defendants further argued that they were entitled to official immunity for their action. This argument is clearly without merit under the facts of this case. It is further determined that Dr. Trotter was not acting in a judicial capacity so as to entitle her to judicial immunity.

### B. Erroneous Admission of Evidence

█ Defendants' argument concerning the erroneous admission of evidence is that appropriate principles of relevancy should have precluded the plaintiff from proving the truth of the assertions that revenue-producing athletes (scholarship athletes) and other influential students received preferential academic treatment at the University.[1] On the day for the commencement of the trial, similar contentions were made to the court through an oral argument *in limine*. At that time it was argued that no evidence concerning the truth or falsity of the allegations regarding preferential treatment of students should be admitted, the recent Fourth Circuit case of

*Buschi v. Kirven*, 775 F.2d 1240 (4th Cir. 1985) being cited. The court overruled the motion *in limine*, stating that it was not persuaded that the *Buschi* case and other authority required that all evidence pertaining to the truth or falsity of preferential treatment to students must be excluded. The court concluded that under the facts and circumstances as they then appeared the truth of the criticisms made by the plaintiff would be admissible for other purposes, such as to show motive of the defendants and the like.

Upon a reconsideration of the matter in the light of all the evidence, the court feels that its initial ruling was correct and the same is reaffirmed. In the first place, the facts of the *Buschi* case are clear distinguishable from the facts of this case. Additionally, the *Buschi* court left the door open for exceptions. That Court ruled that the truth of the criticisms of the institution in question would not be admitted, "unless offered for some purpose other than proof of its truth or falsity." Other purposes for which the objected evidence would have been relevant include proof of motive and state of mind of the defendants for the purpose of determining the level and nature of their misconduct; evidence critical to assessment of the credibility of both defendants; and evidence regarding the stated reasons for the job action were pretextual.

### C. Erroneous Instructions to the Jury

█ In their motion and brief, the defendants argued that the court erred in failing to instruct the jury sufficiently to neutralize the prejudicial effect of five weeks of irrelevant testimony concerning the treatment of athletes. In the event irrelevant evidence is admitted in a trial, the trial court has an obligation to diminish its prejudicial effect by giving appropriate instructions to the jury or by the granting of a new trial. *Warren v. Ford Motor Credit Co.*, 693 F.2d 1372, 1378 (11th Cir.

---

**1.** In the course of the opening statement, counsel for defendants conceded certain preferential treatment of athletes at the University.

1982). To some extent the defendants' assertion of erroneous instructions is, in part, a replay of their relevancy argument asserted in the motion in limine and dealt with hereinabove. The court's ruling that the objected to evidence was not irrelevant significantly undercuts the vitality of this argument. There is another phase of the argument which must be addressed.

■ With the aim in mind of clearly focusing on the central issue in the case and to eliminate possible jury confusion, the court gave an instruction which the defendants now say was inadequate. In this regard, the court instructed the jury as follows:

> The jury is to bear in mind that this is a free speech case and that the central issue to be decided is whether the plaintiff was retaliated against because of her exercise of protected speech activities. The guidelines to be used by the jury in determining this issue are set forth hereinafter in these instructions. While many relevant facts and circumstances must be considered by the jury in reaching a decision on the central issue, there are many other issues which are not to be decided in this case. The jury is not called upon to render a decision as to whether it is right or wrong to give preferential treatment to scholarship athletes and other students or on the merits of the admission policies regarding these particular students.

The jury was further instructed in detail regarding the issues for its determination. The court now determines that when the above-quoted language from the instructions to the jury is reviewed and evaluated in the context of the total instructions given, it is neither misleading nor incomplete.

### D. Withdrawal of the Affirmative Defense from the Jury

■ The defendants strongly contend that by virtue of the makeup and language of the interrogatories and general verdict form they were precluded from having the third prong of the *Mt. Healthy* rules submitted to the jury.[2] Specifically, defendants assert that the interrogatories and general verdict form withdrew their affirmative defense that the employment actions would have been taken in any event from consideration by the jury.

The court's first two interrogatories to the jury asked the following:

1. Was the plaintiff's removal as Coordinator of the English component in violation of her free speech rights under the First Amendment?

2. Was the plaintiff's nonrenewal in violation of her free speech rights under the First Amendment?

Further instructions in the verdict form were as follows:

> If your answer to questions 1 or 2 under Interrogatories is "No," then you must render a verdict in favor of both defendants. If your answer to questions numbers 1 or 2 is "Yes," then you must render a verdict in favor of the plaintiff and against the defendant or· defendants. . . .

The court disagrees with the position taken by the defendants, and holds that the third prong of the *Mt. Healthy* rule was not withdrawn from the jury, but was properly submitted to the jury for their consideration. The court fully charged in a manner which comported with the language of *Mt. Healthy*, and the verdict form was carefully designed to relate to the written instructions. The written instructions were submitted to the jury and taken to the jury room for deliberations. This is a significant point in the light of defendants' argument on withdrawal. In their brief the defendants conceded that the court properly charged the jury pursuant to the *Mt. Healthy* requirements. Further, the court concludes that the language of the interrogatories, as framed, required a determination as to the second and third

---

**2.** *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

prong of the *Mt. Healthy* rule. There could be no finding of a violation of the plaintiff's free speech rights under the first amendment, if the jury had determined that the employment actions would have been taken in any event.

Significant portions of the written charge which was sent out to the jury are set forth below:

... [I]f you find that a preponderance of the evidence establishes that the plaintiff's expressions or conduct in connection with her protected first amendment activities were a substantial or motivating factor in any of the decisions that the defendants made with reference to her employment, then the defendants acted illegally and contrary to the Constitution of the United States, and the defendants can only avoid liability by proving that they would have taken the same actions even in the absence of the protected conduct.

.   .   .   .   .

I charge you Ladies and Gentlemen of the Jury that if you find that one or both of the defendants have established by a preponderance of the evidence that each of the actions they took with reference to the plaintiff's employment would have been taken in any event—that is, even if she had never made any statements or engaged in any activity relating to criticism about preferential treatment for certain students—then there is no violation of the law and you should find for that one defendant or defendants.

.   .   .   .   .

On the other hand, if you find that the plaintiff has carried her burden of proving that the protected First Amendment activities were a substantial or motivating factor in the adverse employment actions taken against her and also that one or both of the defendants have not carried their burden of establishing that they would have taken the same actions even in the absence of the protected conduct, then you must find that defendant or defendants liable to the plaintiff.

### E. Jury Confusion

■ Another ground advanced by the defendants in support of their motion for a new trial is confusion of the jury. Specifically, defendants assert that confusion of the jury is evident from the fact of the size of the award of damages in this case, and this confusion is of such magnitude as to warrant a new trial. *See Petes v. Hayes,* 664 F.2d 523 (5th Cir.1981); *Weingart v. Allen & O'Hara, Inc.,* 654 F.2d 1096 (5th Cir., Unit B, 1981). Defendants seem to be primarily objecting to the size of the award in the jury verdict, asserting that it obviously was a result of confusion. Defendants point to the awarding of the higher amount of punitive damages against defendant Trotter as compared to the award against defendant Ervin. The issues relating to punitive damages and the amount of the award are discussed more fully hereinafter.

There is nothing in the record, in the court's observation of the jury, or from any other matter brought to the court's attention, regarding the jury which in any way indicated that the jury was confused as to the facts or the law. The jury, consisting of six (6) persons selected by the lawyers, was majority female, and its members were attentive, intelligent and courageous. During the course of the several weeks of trial, none of the six who actually deliberated asked to be relieved from jury service or otherwise evidenced disappointment in serving the long period of time. After the jury received the case, they deliberated for approximately a day and a half over a three-day period. From all indications, they carefully reviewed the evidence and only asked for assistance from the court in one instance, requesting the location of the "reasons" memorandum prepared by defendant Ervin in relation to one of the job decisions he made. It is worthy to note that the jury did not ask any questions of the court with respect to the evidence, the instructions of the court, or the interrogatories and verdict form.

Other factors reveal that the jury was not confused. The plaintiff testified that her mental distress and depression continued for a period of two years. As damages for mental distress, the jury awarded $200,000, which might very well be computed at $100,000 per year for the plaintiff's wounded feelings.

Accordingly, the court concludes that the liability determination by the jury was untainted by passion, prejudice or confusion, and will be allowed to stand.

### F. Conditional Remittitur of Punitive Damages Award

The final line of attack on the verdict and judgment in this case deals with the award of damages, primarily with punitive damages. In the alternative, the defendants assert that in the event the court finds that liability of the defendants was properly determined, the court should grant a partial new trial on the issue of damages on the ground that this phase of the jury verdict was based on confusion, passion and prejudice. It is clear that the court is authorized to grant a partial new trial solely on the issues of damages if it is determined that this course of action is demanded. Fed.R. Civ.P. 59(a); *Westbrook v. General Tire and Rubber Co.*, 754 F.2d 1233, 1242 (5th Cir.1985). Further, the defendants argue in the alternative, if the court determines that the damage award is not tainted by passion or prejudice, the court must nevertheless find the award as to punitive damages shockingly excessive, and should, in its discretion, order a new trial as to punitive damages, unless the plaintiff consents to a remittitur of a portion of such damages. In this regard the defendants relied heavily upon the case of *Butts v. Curtis Publishing Co.*, 225 F.Supp. 916 (N.D.Ga. 1964), *aff'd*, 351 F.2d 702 (5th Cir.1965), *aff'd*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). In their brief and in oral arguments before the court as they relate to conditional remittitur, the defendants appear to have only targeted the award of punitive damages. In the written brief the defendants argue that a review of the evidence in this case reveals nothing which would support a punitive damages award. In oral argument before the court, counsel for the defendants did not question the amount of the compensatory damage award, and did not seek any conditional remittitur as to that portion of the verdict. Counsel argued that if the plaintiff recovered $279,681.95, she would be adequately compensated. A special attack on the verdict is made regarding the award of punitive damages against defendant Trotter in an amount higher than the award against defendant Ervin. It is asserted that, based on Dr. Trotter's limited involvement in the various decisions relating to plaintiff's employment, there could be no showing of aggravating circumstances on her part.

### 1. Punitive Damages

The first question to be decided regarding the punitive damages issue is whether the court was authorized to send the punitive damages issue to the jury. The court concludes that the submission of the punitive damages issue to the jury as to both defendants was a correct decision. At the outset it must be pointed out that all issues in this case, including punitive damages, are governed by the applicable principles of federal law rather than state law. This is an action brought under 42 U.S.C. § 1983, which provides for a federal cause of action regarding the deprivation of constitutional civil rights under color of state law.

In the recent case of *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), the Supreme Court of the United States dealt with the issue of punitive damages in the context of a § 1983 action. In the *Smith* case, the Supreme Court held:

> We hold that a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, *or when it involves reckless or callous indifference to the federally protected rights of others.*

(Emphasis added.) *Smith*, 461 U.S. at 56; 103 S.Ct. at 1640.

Defendants specifically argued that under the evidence of this case no aggravating circumstances were demonstrated, particularly as to defendant Virginia Trotter. The instruction to the jury on the standard to be followed in determining whether punitive damages should be awarded was adapted from the punitive damages award approved in *Smith v. Wade,* 461 U.S. at 33–34, 103 S.Ct. at 1628.[3]

A key sentence of the charge to the jury was:

> By aggravating circumstances, I mean evidence that one or more defendant or defendants acted with malice, willfulness, wantonness *or a conscious indifference or callous disregard to the result of their conduct or action.*

(Emphasis added.)

■ While the court does not believe that the evidence presented showed that either of the defendants was motivated by evil motive or intent, the court concludes that the evidence was strong enough to support a finding that the conduct of both defendants involved reckless or callous indifference to the federally protected rights of the plaintiff. The court has discussed that evidence of this case in relation to the issue of liability, and it is unnecessary to repeat it here. In addition, the court concludes that there was sufficient evidence presented upon which the jury could find that the activities and conduct of both defendants with regard to the plaintiff's demotion and nonrenewal were intentional, deliberate and calculated to conceal the reasons for the actions taken. Accordingly,

there was sufficient evidence upon which the jury could have concluded that the conduct of the defendants involved reckless or callous indifference to the federally protected rights of the plaintiff.

■ The federal cases make it clear that punitive damages are fundamentally different from compensatory damages as to reason and purpose. Once a jury finds liability against the defendant, the jury is required to award compensatory damages in an amount appropriate to compensate the plaintiff for his loss or damage. Thus, on a finding of liability, compensatory damages are basically mandatory. On the contrary, whether or not a jury will award punitive damages in an appropriate case is addressed to the sound discretion of fair and impartial jurors. In a case such as this, in addition to a finding of a violation of the plaintiff's first amendment rights of free speech, the jury must also determine whether the conduct of one or more of the defendants was so egregious as to warrant the award of punitive damages in some amount. This is sometimes referred to as a discretionary moral judgment on the part of the jury. *See City of Newport v. Facts Concepts, Inc.,* 453 U.S. 247, 267–268, 101 S.Ct. 2748, 2759–60, 69 L.Ed.2d 616. The purpose of punitive damages under federal law is to punish that defendant and deter him and others from like conduct. *Smith, supra; City of Newport, supra.* The charge to the jury in this case adequately covered the principle that punitive damages is not to be awarded as a matter of right

**3.** PUNITIVE DAMAGES

I charge you further that in addition to any other damages you may award to the plaintiff, you may, but are not required to, award to the plaintiff what is known as punitive damages.

In addition to compensatory damages, the law permits the jury, under certain circumstances, to award the injured person punitive damages, in order to punish the wrongdoer for some extraordinary misconduct, and to serve as an example or warning to the wrongdoer and others not to engage in such conduct.

To be entitled to punitive damages, the plaintiff must prove, and you must find, aggravating circumstances either in the wrongful act of one or more of the defendants or in their intentions.

By aggravating circumstances, I mean evidence that one or more defendant or defendants acted with malice, willfulness, wantonness or a conscious indifference or callous disregard to the result of their conduct or action. The amount of punitive damages assessed against any defendant may be such sum as you believe will serve to punish that defendant and to deter him and others from like conduct.

There is no exact standard for fixing the compensation to be awarded on account of such element of damage but the evidence must show some damage before an award can be made. Any award of damages is to be governed by the fair and just conscience of the jury in the light of the evidence in the case.

upon a finding of liability. As the court stated to the jury, "you may, but are not required to, award the plaintiff what is known as punitive damages."

## 2. Excessiveness of the Punitive Damages Award

■ As pointed out hereinabove, the jury awarded punitive damages to the plaintiff in an amount totaling $2.3 million dollars, with $1.5 million dollars being against defendant Trotter and $800,000 being against defendant Ervin. The judgment pursuant to the verdict showed on its face that it was being entered in favor of the plaintiff and against the two defendants, both in their individual and official capacities. The Supreme Court of the United States has ruled that a judgment against a state official in his official capacity is tantamount to a judgment against the state and is barred by the Eleventh Amendment to the United States Constitution. That Court has also held that the Eleventh Amendment bars monetary judgments against a state or any agency thereof. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 94 L.Ed.2d 662 (1974). Consequently, by operation of law, the judgment resulting from the verdict is against the defendants Ervin and Trotter in their individual or personal capacities.

At the hearing on the motion for a new trial, counsel for the defendants added a new dimension to their argument on the excessiveness of the punitive damages award. Counsel argued that the court should take into consideration the financial resources of the defendants in dealing with the question of excessiveness. It is further argued that when the financial resources available to the defendants to satisfy the judgment are taken under consideration, not only is the judgment excessive but it is oppressive. The attorneys for the plaintiff argued that given the conduct and actions of the defendants toward the plaintiff, the jury verdict as entered was reasonable and appropriate. They further argued that the court should not substitute its judgment for that of the jury; and that it is inappro-

priate for the judge to take into consideration the financial resources of the defendants on the issue of excessiveness, as no evidence was put up on this issue before the jury.

■ It is clear that a federal trial judge has the authority and the duty to require a remittitur of a portion of a punitive damages award if the award is deemed to be shockingly excessive. *Butts v. Curtis Publishing Co.*, supra; *Stapleton v. Kawasaki Heavy Industries, Ltd.*, 608 F.2d 571 (5th Cir.1979); *Matador Drilling Co. v. Post*, 662 F.2d 1190 (5th Cir.1981). In *Curtis Publishing Co. v. Butts*, supra, the district court determined that the punitive damages award in the amount of $3,000,000 was grossly excessive and required a remittitur of all punitive damages in excess of $400,000. In affirming the decision of the trial court, the Fifth Circuit stated the following:

> What the "enlightened conscience" of one impartial jury might consider to be fair may not satisfy another impartial jury with an equally enlightened conscience. A wide variance in the amounts of such awards is inescapably inherent in any submission of the issue of punitive damages.
>
> But, of course, no one would suppose that it is left wholly and solely to the jury. As with every other issue traditionally for jury resolution, the trial judge must still determine whether, as a matter of law, the verdict comports with law.

*Curtis Publishing Company v. Butts*, 351 F.2d 702, 718 (5th Cir.1965).

The circuit court went on to state the following:

> The trial judge had the duty of determining whether as a matter of law (a) any allowance for punitive damages could be made, and (b) what the maximum would be.

*Ibid.* at 718.

The court must address the question of whether the financial resources of the defendants are relevant to the issue of whether punitive damages are excessive in this

case. Several federal courts have considered this issue in the context in a punitive damages award in § 1983 actions. *Shimman v. Frank,* 625 F.2d 80 (6th Cir. 1980); *Harris v. Harvey,* 605 F.2d 330 (7th Cir.1979); *Guzman v. Western State Bank of Devils Lake,* 540 F.2d 948 (8th Cir.1976); *Anglo-American General Agents v. Jackson National Life Insurance Company,* 83 F.R.D. 41 (N.D.Cal.1979); *Estate of Davis v. Hazen,* 582 F.Supp. 938 (C.D.Ill. 1983). In all of these cases it was determined that the net worth or financial worth of a defendant was a relevant factor in determining whether a punitive damages award was excessive, even after the jury had rendered its award. In the *Estate of Davis v. Hazen* case, the Court stated that while the purpose of punitive damages is to punish and to deter, its purpose is not to destroy.

In connection with certain post-trial motions regarding this case, information was presented to the court dealing with the financial resources of the defendants. This information has come by way of affidavits and admissions. In an affidavit signed by Dr. Trotter, it is stated that her current salary is approximately $95,000 per year and that she owns personal assets in the approximate amount of $130,000. An affidavit signed by Dr. Ervin states that his current salary is approximately $60,000 per year and that he owns personal assets in the amount of approximately $100,000. It should be noted that no certified personal net worth statements were presented. Also, in documents and admissions, it was revealed that there exist certain self-insurance programs which would inure to the benefit of the defendants as judgment debtors. It was stated that there is now a total balance in these funds in the approximate amount of $800,000. A statement filed by an officer of the Board of Regents of the University System of Georgia stated that the Board of Regents would agree to be obligated for the lost wages portion of the judgment ($79,681.95). It was further revealed that until December 1985 there existed excess insurance coverage over and above the self-insurance programs that might have been applied to any judgment against the defendants. The insurance carrier for the excess insurance company became insolvent prior to judgment and is now in receivership. It should be noted that no information regarding the financial ability or resources of the defendants was presented to the jury by either side.

The court is not aware of any case authority from the Eleventh Circuit or the former Fifth Circuit dealing with the use of current financial resources as a factor in determining the excessiveness of punitive damages. There is some doubt in the court's mind as to the extent to which it can be used in this case. It appears to this court that it is a reasonable consideration in views of the fact that under § 1983 authority the defendants are personally liable. However, it can be argued that to use this information would violate the maximum recovery rule previously set forth, as that rule deals with a reconsideration of the evidence and a finding as to the amount that reasonably should have been awarded.

The court now turns to a determination as to whether a conditional remittitur is required as to the punitive damages award in this case. At the outset, the court hastens to state that the award of punitive damages as to amount was considered by the court to be exceedingly high from the time it was first read and published. Coincidentally, news accounts attributed to the plaintiff stated that she said that it was "beyond her wildest dreams."[4] As far as the court is aware, this might be the largest amount of punitive damages of record in a § 1983 case involving public employees or officers (particularly university administrators). Reported cases reveal instances of higher awards of punitive damages in other civil rights cases involving claims against major business corporations. The court can only speculate as to what reasons prompted the jury to arrive at the size of the punitive damages award. There was ample evidence from which the jury could

---

4. *The Atlanta Journal,* February 13, 1986, at A4, Col. 3.

have determined that the plaintiff was chastised for speaking out against a long-standing and well-entrenched practice (preferential treatment to athletes) which was beyond the business of an English teacher in developmental studies. This thought is certainly raised by the statement attributed to Dr. Ervin to the plaintiff as to whether she considered herself as important to the University as a star basketball player. The jury certainly had no understanding as to Eleventh Amendment considerations and the coverage of § 1983 with regard to who would be responsible for paying the award. It might be that the jury thought that there was insurance or that others would be equally responsible for the debt. It is most probable that the violation of free speech in the context of the volatile subject of preferential treatment to athletes was a consideration by the jury.

While the court does feel that some of the closing argument of the attorneys for the plaintiff was improper, the transgressions were not grave enough to incite the jury to passion or prejudice.

■ The only legal consideration open to the jury as a guideline in determining the amount of the punitive damages award was the extent to which the egregiousness of the acts and conduct of the defendants called for punishment of the defendants and deterrence to defendants and others from repeating similar conduct. It appears to the court that the jury clearly had in mind meting out a measured dose of punishment and a very large dose of deterrence in reaching the amount of the punitive damages award.

■ The aim and purpose of the jury with regard to its punitive damages award was clearly in order given the facts and circumstances of the case. It was designed to be a message that was loud and clear and far reaching in scope. Unfortunately, the reach and coverage of the award far out distance the aim and purpose, and exceed the limit of punitive damages in the context of this case. The amount of the punitive damages award was and is shock-ingly excessive. Further, to the extent that its weight is to be borne solely by the defendants in their personal capacities, it is oppressive. Although the two defendants, as public officials and university administrators, acted under color of state law, the federal law does not require their employers to pay any part of the verdict. Some might argue that this is not fair, as it does not appear that the defendants were on a frolic of their own or operated in a vacuum. The policy of the law under the Supreme Court decisions and the Eleventh Amendment to the United States Constitution is otherwise.

In accordance with the prevailing case authority, the trial court has a duty to endeavor to keep an award of punitive damages within reasonable bounds considering the role of punitive damages and the relevant facts and circumstances of the case. Upon due consideration to all relevant facts and applicable law, the court concludes that the award of punitive damages in this case was shockingly excessive. Upon a consideration of all the relevant evidence produced at the trial, the court concludes that the maximum sum in terms of a reasonable range that should have been awarded against the two defendants in total amount is $400,000. In reaching this amount, the court is guided by the prevailing rule as set forth in *Warren v. Ford Motor Credit Co., supra,* commonly referred to as the "maximum recovery rule." The court feels compelled to state that the information and evidence brought to the attention of the court relating to the financial resources of the defendants and other resources available for possible satisfaction of the judgment have not been disregarded.

■ In regard to the individual defendants and the amount of punitive damages that should have been reasonably awarded against each, the court finds no justification in the evidence to warrant an award of a larger amount of punitive damages against defendant Trotter than against defendant Ervin. It is true that defendant Trotter was the supervisor and had greater

authority. The jury might have thought that she directed the action of Dr. Ervin, but this was not established by the evidence. What the evidence does establish is that both defendants were involved in the adverse employment decisions made regarding the plaintiff, and their culpability is determined to be equal. Consequently, it is concluded that the punitive damages award against each defendant should not have reasonably exceeded $200,000 each.

In arriving at the aggregate amount of punitive damages that should have reasonably been awarded against the defendants, the court has considered the amount of the award of damages for mental anguish ($200,000), and has determined that the doubling of that amount is a reasonable amount to be awarded in this case. The court knows of no law that requires such a determination, and this approach is simply being used as a yard stick that seemed reasonable and appropriate in this case.

Another collateral consideration, not completely relevant to a determination of the punitive damages award, is the fact that the plaintiff still has the right to recover attorneys' fees and expenses of litigation separate and apart from any other damages. In a civil rights case brought pursuant to § 1983, a prevailing party who receives substantial relief is entitled to an award of attorneys' fees and expenses of litigation.

### III. OTHER CLAIMS

In a separate motion, the plaintiff has stated that she is entitled to the equitable remedy of reinstatement, and, as an alternative, requests that in lieu of reinstatement, if the court determined otherwise, that she be awarded front pay. The defendants stated in their briefs and in open court that, in the event their motion for new trial is overruled, they would not oppose the reinstatement of the plaintiff under appropriate conditions to be set by the court. This stipulation is acceptable by the court. The court prefers that the matter of reinstatement be negotiated and that a joint position of agreement or disagree-

ment be promptly made to the court. The plaintiff is required to file her claim for attorneys fees and expenses of litigation within the time frame and in the format prescribed in the local rules of this court.

### IV. ORDER OF COURT

In compliance with the above memorandum opinion, it is hereby ORDERED and ADJUDGED as follows:

1. The motion of the defendants for a new trial as to liability and damages is OVERRULED;

2. The defendants' motion for a new trial as to all damages is OVERRULED, meaning that the compensatory damages awarded in this case in the amount of $79,-681.65 as lost wages, $1.00 for loss to professional reputation, and $200,000 for mental distress shall remain in full force and effect;

3. It is further ORDERED that the motion of the defendants for a new trial as to punitive damages is GRANTED, unless the plaintiff, Jan Kemp, within twenty (20) days after receipt of this Order, shall, in writing, file with the clerk of this court a remittitur of all punitive damages awarded above the sum of $200,000 as to Virginia Trotter and $200,000 as to defendant LeRoy Ervin; and

4. It is further ORDERED that the Order of the court issued pursuant to the request of the plaintiff for a bond in the nature of a supersedeas bond relative to personal property of defendants and the assurances of self-insurance in behalf of the defendants shall remain in effect until further Order of this court.